OPINION OF THE COURT
Louise Gruner Gans, J.
Petitioner Tawana Robinson brings this CPLR article 78 proceeding to challenge an administrative determination by respondents New York City Housing Authority (NYCHA) and its acting chairman Kalman Finkel to terminate her 21-year tenancy. She also seeks relief in the form of a declaratory judgment.
Petitioner is the tenant of apartment 9D at the Washington-Lexington Houses, a public housing project located at 220 East 102nd Street, Manhattan, which is operated by respondents. On August 14, 1996, Ms. Robinson’s son, Donnel Robinson, was arrested on the grounds of Washington-Lexington Houses for unlawful possession of a controlled substance. At the time *57 of his arrest, Donnel was 16 years of age and an authorized occupant of petitioner’s apartment. He had not been in trouble before. According to petitioner, the charges against Donnel, under an unspecified section of the Penal Law, were dismissed and the file was sealed. Respondent has offered no information to the contrary.
By specification of charges dated March 6, 1997, without reference to any section of the Penal Law, Ms. Robinson was notified that a recommendation had been made that her tenancy be terminated for the following reason:
“You failed to cause individuals on the premises with your consent to conduct themselves in a manner conducive to maintaining the project in a decent, safe and sanitary conditions [sic] in violation of the Tenant Rules and Regulations and of your Lease in that on two separate occasions, on project grounds or in the immediate vicinity thereof, your son, Donnel Robinson, and/or your son, Shamel Robinson, both authorized occupants of your project apartment, did unlawfully:
“a) possess marijuana; and/or
“b) possess a controlled substance.”
Petitioner failed to appear on the scheduled hearing date of April 17, 1997, and the Hearing Officer presiding issued a decision and disposition against her on default. However, petitioner thereafter requested that her default be excused, and a new hearing was scheduled. When the hearing was rescheduled, Ms. Robinson was provided with written notice, including a copy of the Housing Authority’s Termination of Tenancy Procedures.
On the date of the rescheduled hearing, August 7, 1997, petitioner and a NYCHA attorney, Mr. Carle, signed a stipulation whereby she agreed that the proceeding would be resolved by dispositions of permanent exclusion of Donnel Robinson[1] from residing in or visiting her apartment and probation. In relevant part, the stipulation provides:
“it is hereby stipulated, consented to and agreed between the New York City Housing Authority (hereafter referred to as ‘Authority) and the Tenant in person as follows:
“1. Upon conditions hereinafter set forth, the Tenant admits and consents to a final determination in the manner as set forth below.
*58 “2. The Tenant neither admits or denies that Donnel Robinson (dob 11/30/80) (hereinafter, ‘Offender’) were authorized to reside in the subject apartment.
“3. The above entitled administrative proceeding shall be disposed of by a determination of permanent exclusion of Offender. The foregoing determination of permanent exclusion prohibits residence in and visitation to the subject apartment by Offender or in any other Authority property or premise in which the Tenant may subsequently reside.
“4. As a further condition of this stipulation, tenant agrees to allow a representative of NYCHA to make unannounced visits to the apartment during the hours of 9:00 a.m and 7:00 p.m for the purpose of confirming tenant’s compliance with this stipulation. Tenant further agrees that a refusal to allow entry into the subject apartment by representatives of NYCHA for the above stated purpose, shall constitute a violation for the terms of this stipulation and may subject the tenant to additional penalties including termination.
“5. In addition to the determination of permanent exclusion specified in paragraph 3 above, the Tenant is placed on GENERAL PROBATION FOR A PERIOD OF NO. 1 YEAR with the understanding that any violation of the Rules, Regulations, Policies and/or Procedures of the Authority shall constitute a violation of this stipulation and will subject the Tenant to additional penalties, including termination. This period of probation will commence when this stipulation is approved by the Members of the Authority.
“6. The tenant further agrees that the contents of this stipulation shall constitute a public record and that NYCHA may make public, information which is limited to the offender.[2]
“9. The foregoing determination shall have the same force and effect as a decision and disposition by the Hearing Officer.
“10. This stipulation shall be subject to the approval of the Members of the Authority. In the event that the Authority shall fail to approve the stipulation, then the matter shall be restored to the administrative hearing calendar for a hearing and this stipulation shall be null and void and without prejudice to either party hereto.”
As is obvious from the text, the stipulation does not address the underlying charges concerning Donnel, and whether or not he was an authorized resident of Ms. Robinson’s apartment either at the time of his arrest or at the time the stipulation was *59 signed. There is no time limit on the authority of a representative of the Housing Authority to make unannounced inspections of the apartment. There are not one but two dispositions, permanent exclusion and probation for one year. The dispositions provided for in the stipulation are said to have the same force and effect as a decision by “the” Hearing Officer, although the stipulation was not signed or “so ordered” by a hearing officer. At the foot of the stipulation there is a separate statement initialed by Ms. Robinson and Mr. Carle: “This stipulation was read and explained to the tenant(s). The tenant(s) acknowledges that he/she/they completely understand the terms of this stipulation and agree to the terms set forth herein.” Nevertheless, Ms. Robinson alleges that she has great difficulty understanding legal matters and limited ability to read legal documents.
There is no record of what transpired when Ms. Robinson appeared for the Housing Authority hearing on August 7, 1997. The stipulation she signed that day along with the agency attorney Patrick Carle is all there is. There is no calendar number given, no hearing officer identified, and no hearing record indicating appearances and disposition. There is no indication that a hearing officer was even present when the stipulation was signed.[3] There is likewise no record of the process followed, or documents other than the stipulation, considered by members of the Housing Authority before it issued its September 17, 1997 determination of status for continued occupancy, approving the stipulation. Petitioner does not acknowledge receipt of this notice, or of a copy of the stipulation itself.
According to the NYCHA, during a monitoring visit on the morning of October 20, 1997, Donnel was present in petitioner’s apartment. There is no claim that drugs were found in his possession or in the apartment. Following this visit, by notice dated April 2, 1998, Ms. Robinson was informed both of the Housing Authority’s recommendation that petitioner’s tenancy be terminated on the basis of her breach of the stipulation and of her right to contest that determination at a hearing. At the *60 hearing, on June 30, 1998, when told that the charge against her was that “you violated the terms of permanent exclusion imposed on your tenancy by stipulation, that ended a prior case, by permitting Donnel Robinson, the excluded offending person, from either living in or visiting your apartment,” Ms. Robinson responded “I admit it.”[4] She testified that the reason Donnel, who has a bone disease, was in the apartment was that he had a medical appointment at nearby Mount Sinai Hospital that day, and she permitted him to sleep at her apartment the night before so that she could make sure that he kept the appointment. According to Ms. Robinson, this was the sole visit her son made to the apartment; she usually saw Donnel at the house of her sister, who lived nearby. She explained that Donnel lived with her cousin in the Bronx, who goes to work at 5 o’clock in the morning, that she was worried Donnel would sleep through the alarm clock and miss his appointment and therefore permitted him to stay with her. At the Hearing Officer’s request, Ms. Robinson presented an affidavit from her cousin Eric Kelly, dated “5-5-97,” in which he stated that Don-nel would be living with him at 2780 Grand Concourse in the Bronx. She testified that Donnel had been living at that address since that date, which is three months before the August 7, 1997 stipulation was signed. (Transcript of June 30, 1998 hearing at 22-23.)
Hearing Officer Julius Briller issued a decision and disposition of termination, dated July 2, 1998, finding that: “[Petitioner] violated the term of permanent exclusion by inviting the offending family member to spend the night in her apartment * * * .” He commented unfavorably on what he perceived to be Ms. Robinson’s casual attitude to a solemn agreement.
The disposition of termination, entered by the Hearing Officer on July 2, 1998, was adopted by members of the NYCHA on July 29, 1998. Petitioner maintains that she never received a notice of this action. On December 10, 1998 the NYCHA, by its housing manager, directed a further notice to Ms. Robinson, stating that her entire tenant file was being forwarded to the office of the tenant administrator for review. The notice stated:
“Before final decision is made concerning termination of your lease, you will be offered an opportunity to appear at a hearing at Central Office. You will *61 be informed in advance of the date and place of such hearing, and you may then bring an attorney or any person or persons whom you wish to assist or represent you.”
However, Ms. Robinson was never notified of any such hearing. Instead she received a further notice dated December 29, 1998, on or about that date, informing her that her tenancy was terminated effective January 31, 1999 and demanding that she vacate the premises by then. Ms. Robinson’s original petition in this proceeding was served on March 26, 1999.
In essence, the amended petition alleges that the Housing Authority’s termination of Ms. Robinson’s tenancy was infected by errors of law, including denial of due process of law, was arbitrary and capricious, rested on abuse of discretion and was unsupported by substantial evidence. In particular, Ms. Robinson alleges that the termination of her tenancy was the result of the Authority’s violation of its own Termination of Tenancy Procedures and of the federal consent decrees they were designed to implement, was based on an unenforceable stipulation, and imposed a disproportionately severe penalty.[5] By way of relief, petitioner Ms. Robinson seeks, inter alia, an order vacating and annulling the NYCHA’s final administrative determination terminating her tenancy rights to her apartment, as well as declaratory relief declaring unlawful enumerated policies and practices followed by the Housing Authority in terminating tenancies, including her own.
In support of her allegations of unlawful agency practices, petitioner has submitted numerous stipulations, tenant affidavits, attorney affirmations and memoranda, and decisions by hearing officers after termination of tenancy hearings in cases of Housing Authority tenants other than petitioner. The Housing Authority does not deny that it uses stipulations, such as that signed by Ms. Robinson, in lieu of holding the termination of tenancy hearings requested by tenants. (A 1998 affirmation by Housing Authority attorney Henitz, submitted by petitioner, states that his practice is to offer stipulations to tenants in cases where the person accused of misconduct does not reside in the apartment.) Statute of Limitations
Respondent’s initial statute of limitations defense to this proceeding was addressed and disposed of by the court’s deci *62 sion and order dated September 9, 2000, denying the motion to dismiss and directing respondent to answer. Although respondent took the position that despite a notation showing another date it had mailed the July 29, 1998 notice of decision to terminate to petitioner on July 31, 1998, petitioner denied receipt of the notice, and the court found the affidavit of Housing Authority employee Joan Fiorini insufficient to raise the presumption that the letter was received.
“A CPLR article 78 proceeding against a public ‘body or officer must be commenced within four months after the determination to be reviewed becomes final and binding’ (CPLR 217 [1]).” (Matter of Carter v State of New York, 95 NY2d 267, 270 [2000].) An administrative action is not final and binding within the contemplation of CPLR 217 until it “ ‘has its impact’” upon petitioner. (Matter of Edmead v McGuire, 67 NY2d 714, 716 [1986].) Under this formulation, in Housing Authority termination cases, the statute of limitations does not begin to run until the petitioner receives notice of the determination to terminate. (Matter of Bludson v Popolizio, 166 AD2d 346 [1st Dept 1990].) Thus, the July 29, 1998 notice of decision to terminate Ms. Robinson’s tenancy by members of the Housing Authority would be the relevant impact causing determination. However, Ms. Robinson asserts in the amended petition that the first notice she received was the December 10, 1998 notice. Since, by its terms, the December 10, 1998 notice indicated that the administrative process was not complete as of that date, termination as of both July 29, 1998 and December 10, 1998, was still not unambiguously final. (Matter of Carter v State of New York, supra, 95 NY2d at 270.) Consequently, the four-month limitations period did not commence until petitioner’s receipt of the December 29, 1998 notice to vacate, which annexed the July 29, 1998 notice of decision to terminate. (See Matter of Stephens v New York City Hous. Auth., 293 AD2d 318 [1st Dept 2002].) Therefore, Ms. Robinson’s petition, filed on March 26, 1999, challenging the decision to terminate her tenancy is not time-barred.
Respondent presents a separate statute of limitations defense, pursuant to CPLR 217, to Ms. Robinson’s challenge to the validity of the stipulation she signed in lieu of the hearing on August 7, 1997. According to respondent, Ms. Robinson was required to seek relief from that stipulation within four months of the time the stipulation was approved by the Housing Authority Board on September 24, 1997. The court disagrees. At those times, the signing of the stipulation was part óf a still *63 ongoing, incomplete, Housing Authority administrative process. By including in its form stipulation the provision that the dispositions had the same force and effect as a decision by a hearing officer, and submitting it to members of the Housing Authority for approval, the Housing Authority treated it as part of the administrative process prescribed by the Termination of Tenancy Procedures. However, it denied finality to that administrative process by failing to provide the required record, which would permit article 78 review. (Termination of Tenancy Procedures 9, 11; CPLR 7804 [e]; Matter of Yarbough v Franco, 95 NY2d 342 [2000]; Matter of Lydon v New York State Div. of Hous. & Community Renewal, 158 AD2d 291 [1st Dept 1990].) The dispositions of “eligible subject to permanent exclusion” and probation, provided for in the stipulation, did not finally resolve whether petitioner’s tenancy would be terminated; the question was merely conditionally deferred. Indeed, consistent with this analysis, Blackman v New York City Hous. Auth. (280 AD2d 324 [1st Dept 2001]), which involved a challenge to a stipulation signed several years before the determination of termination, indicates that the date of receipt by the tenant of the Housing Authority’s notice of its termination determination (or of the even later notice to vacate) is the date from which the four-month period begins to run, and not the date of the signing of the stipulation. The cases cited by respondent do not involve article 78 proceedings and are inapposite. Finally, as previously discussed, Ms. Robinson did not experience the final impact of the administrative process until she learned from the December 29, 1998 notice to vacate that she was facing imminent eviction from her apartment.
Transfer to the Appellate Division
Respondents next urge that this proceeding be transferred to the Appellate Division, First Department, because petitioner has raised a “substantial evidence” issue in her petition. However, it is not the parties’ characterization of the issues that determines whether a proceeding must be transferred. (See Matter of Save the Pine Bush v Planning Bd. of City of Albany, 83 AD2d 741 [3d Dept 1981].) By the terms of CPLR 7804 (g), the mere presence of a substantial evidence question does not mandate that all of the issues raised be disposed of by the Appellate Division. (See Siegel, NY Prac § 568 [3d ed].) Thus, where a petition raises issues that can terminate a proceeding without reference to the question of substantial evidence, the Supreme Court is to decide those questions in the *64 first instance. Here petitioner’s claims of errors of law, such as failure to follow required legal procedures, including prehear-ing procedures, are sufficient to terminate the proceeding without considering the question of substantial evidence and transfer of this proceeding to the Appellate Division is not required pursuant to CPLR 7804 (g).
In any event, at the June 30, 1998 hearing, petitioner did not deny that she signed the stipulation and admitted that she breached it by permitting her son Donnel to visit her overnight on October 19-20, 1997. In light of this admission and the allegations of the amended petition that the underlying Housing Authority proceedings are tainted by errors of law and abuse of discretion as to the penalty imposed, no substantial evidence question is presented.
“Where, as here, the article 78 petition challenges the respondent’s application of a rule to undisputed facts, no substantial evidence question arises (Matter of Duboff Elec. v Goldin, supra; see, 8 Weinstein-Korn-Miller, NY Civ Prac 7804.09). Rather, the question is whether the respondent’s interpretation and application of its rule was arbitrary and capricious (Matter of Tommy & Tina v Department of Consumer Affairs, 95 AD2d 724 [1st Dept 1983], affd 62 NY2d 671).” (Rosenkrantz v McMickens, 131 AD2d 389, 390 [1st Dept 1987].)
Thus, no transfer to the Appellate Division is required. Violation of Respondents’ Rules
Petitioner asserts that respondent impermissibly violated its own rules. The NYCHA’s Termination of Tenancy Procedures provide:
“project manager interview
“2. The project manager or his representative will interview the tenant in order to discuss the problem which may lead to termination of tenancy, seek to ascertain the facts involved, and, when appropriate, seek to assist the tenant by securing outside help.
“the tenancy administrator
“3. If remedial action by the Manager fails, or if the Manager believes that termination of tenancy is the appropriate course of action, he shall submit the entire file, together with his written recom *65 mendations and the reason therefor, to the Tenancy Administrator for review and appropriate action. If the case is based on non-desirability, the Manager shall consider in reviewing the file, among other things, the extent of the impact of the behavior of the tenant’s family upon the project. If the Tenancy Administrator finds, after review of the file that a basis for termination of tenancy proceedings exists, the file shall be referred to the Legal Department for the preparation of a Notice of Charges.”
There is no dispute that no such discussion was had with petitioner. Rather, respondent asserts that such a discussion is not required before a manager forwards the matter for a hearing because the charge involved allegations of criminal drug activity. Respondent cites no authority for this distinction between “common breach of rules and regulations, such as untimely payment of rent or improper disposal of garbage” and alleged drug possession. (Respondent’s mem of law at 11.) On the contrary, the Housing Authority Termination of Tenancy Procedures state at the outset that they “deal with termination of tenancy brought on any of the following grounds: Non-Desirability, Breach of Rules and Regulations, Chronic Breach of Rules and Regulations, Chronic Delinquency in the Payment of Rent, Non-Verifiable Income, Assignment or Transfer of Possession, Residual Single Person Occupancy and Misrepresentation” (H 1). Moreover, the language of the Termination Procedures (H 2) is that the manager “will,” not “may,” interview the tenant. Indeed, respondent’s interpretation is contradicted by the analysis in Escalera v New York Hous. Auth. (924 F Supp 1323, 1328 [SD NY 1996]), where the court identified the project manager interview as the first of the four decision-making levels provided for in the consent decree underlying the Termination of Tenancy Procedures.[6]
The court does not address petitioner’s arguments based on the Housing Authority’s management manual and its instructions for differential treatment of drug related nondesirability cases, depending on the seriousness of the Penal Law provisions under which an arrest was made. The manual sections submitted do not reflect amendments of the Penal Law, includ *66 ing the repeal of Penal Law § 220.05 in 1985. (L 1985, ch 341, § 2, eff Nov. 1, 1985.)[7]
Respondent Housing Authority argues that since her tenancy was not initially terminated, but petitioner stipulated to a lesser penalty — permanent exclusion and probation — respondent did not violate its own procedures. The court rejects this argument. This “lesser penalty” resulted after petitioner received respondent’s March 6, 1997 notification of a recommendation to terminate her tenancy because of Donnel’s arrest. It is respondent’s failure to follow the procedures prior to issuing the recommendation to terminate petitioner’s tenancy in March 1997 that is at issue here. Had the project manager interviewed Ms. Robinson, investigated Donnel’s problems in relation to his first time arrest, learned of its criminal court disposition, and sought to assist them, the termination proceedings may not have been initiated at all.[8]
Where the Housing Authority fails to follow its own procedures in terminating a public housing tenancy, the termination must be annulled. (Matter of Garner v Tuckahoe Hous. Auth., 81 AD2d 915 [2d Dept 1981], cited in Matter of Brown v Popolizio, 166 AD2d 44 [1st Dept 1991].) In Garner, as here, the local Housing Authority had failed to investigate and consult with the tenants before formally seeking to terminate their tenancy. The termination of tenancy was annulled “[because] the [agency] failed to follow its own rules” (Garner v Tuckahoe Hous. Auth., supra, 81 AD2d at 919), which required the preliminary investigation and consultation. The same result was mandated for failure to follow required preliminary procedures in cases involving other administrative settings where, as here, substantial rights were affected. (Matter of Benjamin v McGowan, 275 AD2d 290 [1st Dept 2000]; Allen v Blum, 85 AD2d 228 [1st Dept 1982], affd 58 NY2d 954 [1983]; Matter of Lehman v Board of Educ., 82 AD2d 832 *67 [2d Dept 1981].) Contrary to respondent’s argument, petitioner’s subsequent stipulation does not obliterate its initial responsibility to follow its own rules as to the preliminary steps it is required to take prior to recommending termination. Nothing in respondent’s termination procedures “suggests that the Authority’s obligation in this respect is subject to waiver.” (Garner v Tuckahoe Hous. Auth., supra, 81 AD2d at 918.) Unlawful Stipulation Practice
While the violation of respondent’s own rules is a sufficient basis for annulling the Housing Authority’s administrative determination to terminate Ms. Robinson’s tenancy, it is not the only basis for this result. Alternatively, petitioner asserts and the court finds that the Housing Authority’s practice of replacing the procedural safeguards of a recorded hearing before an impartial hearing officer incorporated in the Termination of Tenancy Procedures to provide due process of law with form stipulations between unrepresented tenants and Housing Authority attorneys is contrary to the consent decrees from which they derive, and is thus contrary to law. (CPLR 7803 [3].)
Two federal constitutional decisions form the backdrop for consideration of the issues raised by the Housing Authority’s stipulation practice: Escalera v New York City Hous. Auth. (425 F2d 853 [2d Cir 1970], cert denied 400 US 853 [1970], consent decree on remand docketed Mar. 25, 1971, 67 Civ 4307 [SD NY 1971, Mansfield, D.J.]) and Tyson v New York City Hous. Auth. (369 F Supp 513 [SD NY 1974], 73 C 859, 74 C 1856, 74 C 2556, 74 C 2617 [Metzner, J.] [Tyson-Randolph]).[9]
In Escalera (supra), a class action, the United States Court of Appeals held, in relevant part, that “[t]he government cannot deprive a private citizen of his continued tenancy, without affording him adequate procedural safeguards * * * ” (425 F2d at 861), and that in cases involving alleged tenant nondesir-ability, due process, at minimum, requires that the tenant have adequate advance notice, an evidentiary hearing on the record, with an opportunity to confront and cross-examine and *68 otherwise to be informed of the evidence, before an impartial hearing officer. {Id. at 862-863.)
With these important due process requirements already ruled upon, after remand to the District Court for further proceedings, the “Escalera consent decree” was entered,[10] setting out the basic procedures for notice and hearing required by the applicable principles of due process of law in processing termination of tenancy proceedings against all tenants in public housing projects, including on the grounds of nondesirability. (Paras 1, 2, 3.) The “Procedures for Termination of Tenancy” were set out in 12 paragraphs, which formed the original basis for the Housing Authority’s “Termination of Tenancy Procedures.” The procedures could be amended in the future, “provided that, any changes are consistent with, and do not contravene due process of law” (§ 12).
In the judgment incorporating the consent decree, District Judge Mansfield specifically approved the new procedures for termination of tenancies incorporated therein, “as in conformity with the requirements of due process of law as set forth in Escalera v. NYCHA, 425 F.2d 853 (2d Cir. 1970).” (Escalera v New York Hous. Auth., 924 F Supp 1323, 1328 [SD NY 1996].)
The Tyson-Randolph cases involved a challenge to the application of substantive rules of nondesirability by the Housing Authority and to aspects of the Termination of Tenancy Procedures then in place. The substantive question presented was “whether the HA may constitutionally evict an entire family from public housing on the sole ground that an adult child in that family, who does not reside in the parental home, has committed criminal acts which are deemed nondesirable.” (Tyson v New York City Hous. Auth., supra, 369 F Supp at 518.) The Federal District Court, denying the Authority’s motion to dismiss, ruled that under principles of due process the Housing Authority could not do so, in that “liability may be imposed on an individual only as a result of that person’s own acts or omissions, not merely because of his association with any group.” (Id.) The consent decree in Tyson-Randolph (supra), incorporating substantive, as well as further procedural, limi *69 tations on terminations of tenancy by the Housing Authority for nondesirability, was negotiated following that decision.
The Tyson consent decree prohibited the initiation of a termination of tenancy proceeding or determination of ineligibility of a tenant for continued occupancy, based on allegations of nondesirable activity by an adult child of the tenant or other person which occurred at a time when the adult child or other person did not reside with the tenant. This prohibition was further refined by the Randolph consent decree.
The Randolph consent decree directed that all future termination of tenancy proceedings initiated by the Housing Authority on the grounds of nondesirability be conducted pursuant to “New HA Regulations,” subject to amendment not inconsistent with the stipulation underlying the consent decree” (§ D.
As a basis for the newly adopted procedures, constituting the Housing Authority’s Termination of Tenancy Procedures, the Housing Authority agreed and the Federal District Court ordered that qualified hearing officers would make specific written findings of fact on all issues raised at a termination hearing, and make a determination of the tenant’s eligibility status; that such findings and determination would be based solely on evidence presented at the hearing; that such evidence would constitute the “record”; that review of the hearing officer’s decision by members of the Housing Authority would be based upon this record, and that the hearing officer’s decision would be binding on members of the Housing Authority unless it was contrary to law (§ 2 [a]). These provisions are incorporated virtually verbatim in paragraphs 9 and 11 of the procedures. Two related procedures provide that the hearing officer must be an impartial, disinterested attorney (If 5) and that the proceeding must be mechanically recorded and subject to transcription (If 7).
In relevant part, the Randolph consent decree also provided for a series of dispositional options short of termination of tenancy, “where any charge of non-desirability has been proven” including probation, eligible subject to permanent exclusion of one or more persons in the household, and eligible, with the proviso, that “[w]here the offender(s) has (have) removed from the household, it is mandatory that there be a decision of ‘eligible,’ ‘probation,’ or ‘eligible subject to the permanent exclusion of one or more persons in the household’” (§2 [b]). These provisions are incorporated in paragraphs 10, 13, 14, and 15 of the procedures.
*70 The new Termination of Tenancy Procedures also provided guidelines for allocation of evidentiary burdens at the termination of tenancy hearing. Thus, at the hearing, the Housing Authority’s legal department is required to present its case for termination by offering testimony and written evidence of the charges specified in the termination notice; the tenant may offer testimony and documentary evidence in response to the charges; and both parties have a right to cross-examine (H 6 [a]). Likewise, where the charges against the tenant are based on nondesirable acts of a person other than the tenant, “it is the Housing Authority’s responsibility to prove that the offender occupied the premises at the time of the offense.” If this is proven, “the tenant may still show that the offender has permanently moved out by the time of the hearing” flf 6 [d]).
Neither the Escalera nor the Tyson-Randolph consent decrees make any provision for stipulations in lieu of the hearing process outlined in the several decrees. The Housing Authority’s Termination of Tenancy Procedures, expressly promulgated to conform with the Escalera decision and the consent degrees, have not been amended to prescribe procedures for the resolution of termination of tenancy proceedings by stipulation.
By signing the stipulation as she did, Ms. Robinson lost the procedural protections and substantive rights accorded her by the Escalera decision, the Escalera and Tyson-Randolph consent decrees and the Termination of Tenancy Procedures, including the right to a hearing before a hearing officer who is required to be impartial; instead, her only documented contact was with a Housing Authority attorney who, by definition, is not impartial; the right to a hearing on the record and to a decision by the hearing officer; here, there is no record and no other indication that the stipulation was either reviewed or approved by a hearing officer. The Housing Authority was never required to prove the nature of Donnel’s alleged undesirable conduct. There is no official record before this court of the criminal court proceeding, which would detail the charges against him and the reason for the alleged disposition of dismissal in criminal court. On the bare allegation that there was a charge of possession of a controlled substance, and that it was dismissed, there is no meaningful way to evaluate either the facts of Donnel’s arrest or why the charge was dismissed.
Without a hearing, Ms. Robinson lost the opportunity to establish that at the time of the hearing her son Donnel was no longer an occupant of the apartment, so that she was not *71 subject to termination and did not need to bargain for a disposition of permanent exclusion or probation. On August 7, 1997, in preparation for the scheduled hearing, Ms. Robinson had in her possession the sworn May 5, 1997 statement of her cousin Mr. Kelly that Donnel lived with him in the Bronx as of that date, but had no chance to place it in evidence on the record. Also, by signing the stipulation, Ms. Robinson became subject to multiple dispositions (permanent exclusion and probation) and to unannounced searches of her apartment for an indefinite period of time, not authorized by the consent decrees or by the procedures. Finally, Ms. Robinson lost the opportunity to have the members of the Housing Authority review the disposition in her case based on a hearing record as defined in the procedures, rather than on a barren stipulation.[11]
The point of this recitation is not to suggest that under no circumstances could such rights be relinquished by a stipulation. Rather, it is to show in detail how, by having unrepresented tenants relinquish them through form stipulations, the respondent Housing Authority has replaced a set of procedural requirements designed to provide due process of law, and substantive limitations on the power to evict for non-desirability, with a process that is devoid of any procedural safeguards, circumvents the substantive limitations, and is not subject to judicial review from any contemporaneous record. This substitute process is not only not authorized by the several consent decrees and the procedures, but is utterly inconsistent with their explicit purpose of providing public housing tenants with due process of law before their tenancy may be terminated by State action.
The Housing Authority addressed the wrong question when it argued that since neither the Escalera decision nor the consent decrees prohibit waiver of the hearing rights established thereunder, it is not precluded from offering stipulations to tenants in termination of tenancy proceedings without any participation by an impartial hearing officer on the record. However, Escalera v New York Hous. Auth. (924 F Supp 1323 [SD NY 1996]) held that the Housing Authority could not unilaterally interpret the Escalera consent decree to substitute *72 summary court proceedings for the administrative proceedings prescribed by the consent decree.
In the 1996 Escalera proceeding, the Housing Authority had sought clarification or modification of the underlying consent decree, arguing that in cases where a Housing Authority apartment was used for the sale of illegal drugs, the consent decree did not prohibit it from initiating summary eviction proceedings against tenants, pursuant to RPAPL 711 (5) and 715 (the Bawdy House Law), in New York City Civil Court, in lieu of the administrative proceeding provided for in the Escalera consent decree. Strictly construing the express terms of the consent decree, the District Court rejected this interpretation. The court found that, while involving different procedures, the summary proceeding and administrative proceeding “address the same problems and achieve the same result.” {Id. at 1337.) Nevertheless, the court concluded that this did “not alter the reality that within the four corners of the Escalera Decree the Housing Authority, in order to evict drug-trafficking tenants, unambiguously agreed to adopt a different set of procedures and a different legal theory from those adopted by the Bawdy House Law.” {Id. at 1337-1338).[12] The proper question, the court held, was not whether the substitution of an alternate procedure was prohibited, but whether, within the four corners of the consent decree, it was authorized. {Id. at 1338.)
Here, there is an alternative process with procedural safeguards removed. The stipulation process, involving unrepresented indigent tenants, presents an increased risk of error because of their recognized difficulty in understanding their rights and the meaning of stipulations (see 144 Woodruff Co. v Lacrete, 154 Misc 2d 301 [Civ Ct, Kings County 1992], and studies cited therein). The stipulation process also permits the substantive basis for termination of tenancy provided in the Tyson-Randolph consent decrees and the Termination of Tenancy Procedures to be changed. Once a stipulation is signed, as in Ms. Robinson’s case, without explicit admission of the original charges, a termination of tenancy hearing is held only for alleged violation of the stipulation (procedures 24), and need not at all involve “non-desirable” drug related conduct by the tenant or other member of the household. In consequence, the Housing Authority was not required ever to meet its burden of establishing “nondesirability” as a basis for *73 termination. A visit by her nonresident son, without documented connection to any drug related criminal offense, became a sufficient basis for termination of tenancy.
While fully aware of New York’s longstanding policy favoring resolution of disputes by stipulation (Hallock v State of New York, 64 NY2d 224 [1984]; Abramovich v Board of Educ., 46 NY2d 450 [1979]), and that federal constitutional rights, including the right to a hearing, are subject to waiver (Over-myer Co. v Frick Co., 405 US 174 [1972]), provided such waiver was voluntary, knowing and intelligent (Fuentes v Shevin, 407 US 67 [1972]; Overmyer Co. v Frick Co., supra; see Alexander v Gardner-Denver Co., 415 US 36, 52 n 15 [1974]), the court is unable to agree with the Housing Authority that the execution of the stipulation by the unrepresented Ms. Robinson with a Housing Authority attorney whose obligation was to advance the Housing Authority’s interest, not hers, without a record and without review and approval by a hearing officer is defensible as a matter of law on the theory of contractual waiver. The objective circumstances under which the stipulation was executed by Ms. Robinson and a Housing Authority attorney do not satisfy the requirements for waiver of federal constitutional rights.
The appropriate standard for determining whether stipulations such as that signed by Ms. Robinson should be given binding effect is that provided by federal law, rather than that applicable to contracts generally, i.e., whether it was entered into by “fraud, collusion, mistake or the like,” as articulated in Romero v Martinez (280 AD2d 58, 63-64 [1st Dept 2001]), a case involving a Housing Authority stipulation.
As explained in Morris v New York City Employees’ Retirement Sys. (129 F Supp 2d 599, 605-606 [SD NY 2001]), because “ ‘ “the question of a waiver of a federally guaranteed constitutional right is * * * a federal question controlled by federal law,” ’ federal law applies” to a challenge to the waiver (citing Legal Aid Socy. v City of New York, 114 F Supp 2d 204, 226 [SD NY 2000], quoting Brookhart v Janis, 384 US 1, 4 [1966]), and the standard for assessing such a waiver is whether it was voluntary, knowing and intelligent. (Fuentes v Shevin, 407 US 67 [1972]; Overmyer Co. v Frick Co., 405 US 174 [1972]; see Alexander v Gardner-Denver Co., 415 US 36, 52 n 15 [1974].) Equality of bargaining power between the parties and whether there was representation by counsel are relevant factors used in determining whether the contractual waiver of constitutional rights was made “with full understanding of the consequences *74 of [the] waiver.” (Erie Telecom., Inc. v City of Erie, Pa., 853 F2d 1084, 1096 [3d Cir 1988].)
Without a record and hearing officer involvement, two of the safeguards provided by the Escalera decision, the consent decrees and the procedures, the stipulation process increases the serious risk of unknowing and involuntary waiver. (See 144 Woodruff Corp. v Lacrete, 154 Misc 2d 301 [Civ Ct, Kings County 1992].) Moreover, “waiver of constitutional rights in any context must, at the very least, be clear [and courts will not be] concern [ed with] involuntariness or unintelligence of a waiver when the contractual language relied upon does not, on its face, even amount to a waiver.” (Fuentes v Shevin, 407 US 67, 95 [1972].) Here, the language of the stipulation signed by Ms. Robinson is opaque legalese. There is no explanation of what is being waived or the meaning and significance of many of the provisions.[13] As in Fuentes v Shevin (supra), respondent Housing Authority has “made no showing whatever that” Ms. Robinson “[was] actually aware or made aware of the significance of the [waiver provisions].” (Id.)
There is no factual dispute that the stipulation here was not made on the record, was not independently reviewed by a hearing officer, that petitioner lacked legal representation, that the role of the Housing Authority attorney was partisan, per se,[14] that the stipulation itself did not clearly show waiver, and that the bargaining power between Ms. Robinson and the Housing Authority was unequal. As a pure question of law, the court may consider these factors in relation to waiver even if not raised by petitioner at the administrative hearing. (Carnegie Hall Corp. v City Univ. of N.Y., 286 AD2d 214, 215 [1st Dept 2001] .)[15]
*75 Based on these factors, as a matter of law, the stipulation could not effect an informed, knowing and voluntary waiver of Ms. Robinson’s constitutionally protected federal rights.
The Housing Authority has the option to amend its Termination of Tenancy Procedures to provide for the use of stipulations, with appropriate procedural safeguards, and/or seek federal court approval. “Combatting the drug crisis infesting the city’s housing projects is an important objective. It can, and should be, accomplished, however, without violating or disregarding due process rights of tenants.” (Brown v Popolizio, 166 AD2d 44, 57 [1st Dept 1991].)
The Penalty of Termination of Tenancy Was Excessive
This court considers that, on the present very limited record and lack of record, the penalty of termination of tenancy was excessive. All it shows is that Ms. Robinson’s son, Donnel, was arrested for possession of a controlled substance, not in the apartment but somewhere on project premises. Donnel was not convicted and the charges against him were dismissed. He moved out of the apartment in May 1997 or, according to Ms. Robinson’s reply affidavit, even earlier, in March 1997. The Housing Authority does not claim otherwise. A termination of tenancy proceeding had been initiated against Ms. Robinson and she signed the stipulation, which provided, inter alia, that he would not visit her at the apartment.
Thereafter, as Ms. Robinson herself stated, she unthinkingly allowed Donnel to stay in her apartment overnight, so as to make sure that he kept an important hospital appointment for his bone disease at Mount Sinai Hospital, literally across the street from the project. Imprudently, she acted like a mother.
Not only is the nature of Donnel’s alleged offense unclear, but the assumption of Ms. Robinson’s ability to control his conduct outside of the apartment hangs by the slenderest of inferential threads. His single October visit involved no misconduct by Donnel which could conceivably threaten the health and welfare of the other tenants of the project where Ms. Robinson resides. Nevertheless, although Donnel was not found to be subject to sanction by the criminal justice system, and no longer lived in the project according to the Housing Authority, Ms. Robinson, his utterly unsophisticated mother, must be punished by being evicted from her home of more than 21 years and subjected to the risk of homelessness. The discon *76 nect between the need to protect Housing Authority tenants from drug sellers and addicts and the facts of Ms. Robinson’s case is too great to support this outcome. The penalty of termination here is unduly harsh and shockingly disproportionate. (Matter of Stroman v Franco, 253 AD2d 398 [1st Dept 1998].)
For all of the foregoing reasons, the court determines that the termination of petitioner’s tenancy was arbitrary, capricious and contrary to law. The court does not consider that a grant of declaratory judgment is required. (Jackson v Bider-man, 151 AD2d 400 [1st Dept 1989].)
Accordingly, it is ordered and adjudged that the petition is granted and respondents’ determination to terminate petitioner’s tenancy is annulled.

. It appears that the issue of Shamel Robinson’s alleged misconduct was not pursued by NYCHA and that Shamel still resides with Ms. Robinson.

. Paragraphs 7 and 8 deal with change of apartments and locks.

. Although the lack of hearing officer involvement when Ms. Robinson signed the stipulation, as illustrative of Housing Authority practice, was raised in the amended petition (paras 44, 61, 63), the Simon affirmation (paras 19, 35) and petitioner’s memorandum of law in support of the petition (at 1), this court directed the parties to submit further briefs on this issue by an interim decision and order dated September 28, 2001. All briefs were received by November 15, 2001.

. The charge of violation of probation was withdrawn by the Housing Authority at the hearing because by the time of the hearing the period of probation had expired. Nevertheless, it was still cited as a violation by members of the Housing Authority in its July 29, 1998 determination.

. A copy of the Termination of Tenancy Procedures is annexed to this decision.

. This was a proceeding initiated by the Housing Authority to clarify or modify the Escalera consent decree.

. Although at the June 30, 1998 hearing Ms. Robinson indicated that alleged controlled substance possessed by Donnel was crack, the precise nature of the charges underlying Donnel’s arrest cannot be determined without regard to weight (see Penal Law art 220), and is not available to the court. The Housing Authority has not provided more specific information.

. Indeed, in cases where termination of tenancy of public housing based on possession of drugs has been upheld, there has been a charge of intent to sell drugs (Matter of Wooten v Finkle, 285 AD2d 407 [1st Dept 2001]; Matter of Cruz v New York City Hous. Auth., 282 AD2d 230 [1st Dept 2001]; Mon-tanez v Franco, 282 AD2d 282 [1st Dept 2001]; Matter of Walker v Franco, 275 AD2d 627 [1st Dept 2000]; Matter of Bracero v Franco, 272 AD2d 54 [1st Dept 2000]; Matter of Woody v Franco, 260 AD2d 186 [1st Dept 1999]), which is absent in this case.

. Although referred to by petitioner in the singular, there were actually two related actions which had been consolidated but produced two consent decrees, one in which Tyson was the lead plaintiff and addressed substantive limitations on termination of tenancy for nondesirability; and one involving several consolidated class actions in which Randolph was the lead plaintiff. The Randolph consent decree addressed both administrative termination of tenancy procedures and substantive limitations on the disposition of cases based on nondesirability.

. A consent decree is both an agreement of the parties and a judicial decree. “A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.” (Rufo v Inmates of Suffolk County Jail, 502 US 367, 378 [1992].)

. The stipulations, affidavits and legal memoranda from other termination of tenancy proceedings submitted by petitioner indicate that the stipulation practice in this case was one typically followed by the Housing Authority, and that the form stipulations, on substantially the same terms, were drawn up after consultation with members of the Housing Authority (amended petition, exhibit H, j[ 6).

. After extensive hearings, the District Court modified the Escalera consent decree, but the administrative Termination of Tenancy Procedures were left intact.

. What is it that Ms. Robinson admits in paragraph 1; why does she neither admit nor deny that her son was authorized to reside in her apartment in paragraph 2; why is Donnel referred to as “Offender” in paragraphs 2 and 3; does paragraph 4 explain that she is waiving Fourth Amendment rights; what does it mean that Ms. Robinson is subject to both permanent exclusion and probation in paragraphs 3 and 5; and why would violation of any Housing Authority rule, whether or not related to Donnel or to drugs, constitute a violation of the stipulation that could result in termination of her tenancy?

. (See Code of Professional Responsibility DR 7-104 [22 NYCRR 1200.35].) No affirmation by attorney Carle has been submitted.

. “In this case the issue presented * * * is one of law, not fact, which may be raised for the first time on appeal, even before the Court of Appeals (see, Telaro v Telaro, 25 NY2d 433, 439; see also, Matter of Richardson v *75 Fiedler Roofing, 67 NY2d 246, 250; Matter of Travelers Indem. Co. [Levy], 195 AD2d 35, 41-42).” (Id.)